## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **IN RE:  PROCESSED EGG PRODUCTS** | : | **MDL No. 2002** |
| **ANTITRUST LITIGATION** | : | **08-md-02002** |
|  | : |  |
|  | : |  |
| **THIS DOCUMENT APPLIES TO:** | : | JURY TRIAL DEMANDED |
|  | : |  |
| **GIANT EAGLE, INC. V. UNITED EGG** | : |  |
| **PRODUCERS, INC., et al.** | : |  |
| **Civil Action No. 2:11-cv-00820** | : |  |
|  | : |  |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Giant Eagle, Inc. ("Giant Eagle" or "Plaintiff") brings this civil action against

defendants United Egg Producers, Inc., United States Egg Marketers, Inc., Hillandale Farms of

Pa., Inc., Hillandale-Gettysburg, L.P., Hillandale Farms East, Inc., Hillandale Farms, Inc., Ohio

Fresh Eggs, LLC, Weaver Bros., Inc., Sparboe Farms, Inc., Michael Foods, Inc., Land O'Lakes

Inc., Moark, LLC, Norco Ranch, Inc., Rose Acre Farms, Inc., National Food Corporation, Cal-

Maine Foods, Inc., Daybreak Foods, Inc., Midwest Poultry Services, L.P., Nucal Foods, Inc.,

R.W. Sauder, Inc., and for its Amended Complaint alleges as follows:

### NATURE OF THE ACTION

1. Giant Eagle alleges herein a conspiracy among Defendants and certain unnamed

co-conspirators where they agreed to fix, raise, maintain and/or stabilize the prices at which shell

eggs and egg products (collectively, "eggs") were sold in the United States, including by

controlling the aggregate supply of domestic eggs. Each Defendant knew that it could not do

this by itself and that their output of eggs needed to be restricted by collective action. Thus,

Defendants entered into an overarching conspiracy to manage the aggregate supply of eggs in the

United States. Defendants' conspiracy and their acts pursuant thereto were in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and Ohio's Valentine Act, Ohio Rev. Code §§ 1331.01 and 1331.04-05, and Giant Eagle has been injured in its business and property as a result of those violations.

2.    Shell eggs include both "table eggs" (generally purchased by retail entities for resale to the consuming public) and "breaking eggs" (generally purchased by foodservice entities for further processing). Egg products are breaking eggs that have been removed from their shells and processed into dried, frozen, or liquid forms.

3.    Giant Eagle purchased shell eggs and/or egg products directly from three or more of the Defendants during the relevant period, including but not limited to for the purposes of retail sales and food preparation.

4.    Defendants are horizontal competitors, and include (1) vertically-integrated producers of shell eggs or egg products, or both, and (2) their trade groups. One of those trade groups, the United Egg Producers ("UEP"), is the largest egg trade organization in the United States, and had 198 members representing 96% of the nations' laying hens during the relevant period. UEP consists of individual companies that controlled and were major decisional forces in UEP during the relevant period. Such companies acted with and through UEP and other trade groups during the relevant period to implement and enforce the conspiracy alleged herein.

5.    Defendants understood that one of the most significant influences on egg pricing is supply. Additional supply in the face of relative inelastic demand for eggs causes egg prices to drop, and conversely even small reductions in supply can cause egg prices to rise sharply.

6.     In the egg industry, higher egg prices historically triggered increased egg production as producers attempted to benefit from those prices.  This created a cyclical effect: higher prices leading to excess supply, which would then depress prices again.

7.     Defendants' long-time poultry research economist, Don Bell, determined that if the industry collectively lowered the supply of eggs they could generate more income.  Bell told Defendants that the only way to control the supply of eggs would be through industry cooperation designed to correct the potential problem of periodic over-production.

8.     During the relevant period, Defendants agreed to take many joint collective actions as part of an overarching conspiracy designed to fix, raise, maintain, and/or stabilize the prices of shell eggs and egg products, including but not limited to significant efforts to restrict and/or reduce the United States egg supply.  Defendants were aware of the possibility of antitrust violations as a result of their conduct.

9.     The allegations in this Complaint provide the classic indicia of a cartel, describing Defendants' ability to collude and their actual collusion (through the agreements described above); ability to monitor and police, and actual monitoring and policing, of the cartel (through auditing and collection of commitment sheets); ability to affect and actual, dramatic, affect on market price (as eggs were highly sensitive to supply variations given that demand remained relatively stable); and ability to retaliate and actual retaliation (by foreclosing market access to Non-Certified companies and by interfering with customers of producers that left the conspiracy).

10.     In summary, the Defendants successfully conspired to fix, stabilize and/or maintain egg prices in at least the following nine ways:

(a)     agreeing to reduce the total number of hens at laying farms in order to

        decrease overall egg production;

(b)     agreeing not to replace hens lost through increased cage-space

        requirements;

(c)     agreeing to manipulate the molting, culling, and disposal of hens to keep

        egg production low;

(d)     agreeing not to "backfill" cages (the practice of adding extra pullets from

        growing houses to the cages of older birds to replace mortality );

(e)     agreeing to delay or reduce chick hatching;

(f)     agreeing to reduce inventory;

(g)     agreeing not to expand, and/or agreeing to curtail, operations;

(h)     agreeing to export eggs in order to reduce the egg supply in the United

        States; and

(i)     agreeing overall to manage supply and reduce production of eggs in

        the United States.

## JURISDICTION AND VENUE

11.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15

and 26, and Section 1331.08 of the Ohio Valentine Act, Ohio Rev. Code § 1331.08, for treble

damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the

injuries sustained by Plaintiff from violations of Section 1 of the Sherman Antitrust Act, 15

U.S.C. § 1, and Sections 1331.01 and 1331.04-05 of the Ohio Valentine Act, Ohio Rev. Code §§

1331.01 and 1331.04-05.  The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367(a).

12.     Venue is proper in this District pursuant to 15 U.S.C. § 22, 28 U.S.C. §§ 1391(b) and (c), and Ohio Rev. Code § 1331.08, because during the relevant period many of the Defendants resided, transacted business, were found, or had agents in this district, and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

13.     Defendants are shell and egg products producers and their trade groups.  These entities are involved in the promotion, production, processing, and/or sale of shell eggs and egg products, and the Defendants' respective activities affect interstate commerce.  This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of eggs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Further jurisdictional contacts are alleged below.

## THE PARTIES

14.     Plaintiff Giant Eagle, Inc. ("Giant" Eagle") is a Pennsylvania corporation with its principal offices located at 101 Kappa Drive, Pittsburgh, PA.  Giant Eagle is engaged in the retail grocery supermarket business and, by itself and through its subsidiaries, owns, operates, and licenses over 200 Giant Eagle® supermarkets in Pennsylvania, Ohio, West Virginia, and

Maryland. Giant Eagle sells shell eggs and egg products to its retail customers and uses shell eggs and egg products in its foodservices operations.

15. During the relevant period, Giant Eagle used Topco Associates, LLC ("Topco"), a Delaware limited liability company with its principal offices located in Skokie, Illinois, as its agent for purchasing shell eggs. Topco is a buying cooperative that provides procurement, quality assurance, packaging, and other services for its member-owners, which include supermarket retailers, wholesalers, and foodservice companies. As a privately–held cooperative, Topco has no conflicting profit motive because it distributes substantially all of its earnings back to its member-owners based on each member's level of participation. Giant Eagle is a member of Topco and at all times relevant hereto, Topco acted on behalf of Giant Eagle in arranging purchases of shell eggs from the Defendants for resale by Giant Eagle to the public. Accordingly, Giant Eagle is a direct purchaser of shell eggs from the Defendants through its agent Topco.

16. Additionally, in order to avoid any questions regarding Giant Eagle's standing to assert the claims in this Complaint, Giant Eagle and Topco have entered into an assignment agreement, whereby Topco has assigned to Giant Eagle all of Topco's rights and interests regarding any antitrust claims arising from Giant Eagle's purchase of eggs through Topco, beginning in 1999 and continuing through the date of the assignment (July 28, 2010) or the end of the antitrust conspiracy alleged in this Complaint, whichever date is later. Accordingly, Giant Eagle brings this action in its own right as a direct purchaser as alleged above, and additionally as the assignee of Topco.

17.     Giant Eagle purchases egg products both directly from Defendant Michael Foods and through ConAgra Foods, Inc. ("ConAgra").  Giant Eagle and ConAgra have entered into an assignment agreement, whereby ConAgra has assigned to Giant Eagle all of ConAgra's rights and interests regarding any antitrust claims arising from its purchase of egg products resold to Giant Eagle from 1999 and continuing through the date of the assignment (August 5, 2011) or the end of the antitrust conspiracy alleged in this Complaint, whichever date is later. Accordingly, Giant Eagle brings this action in its own right as a direct purchaser as alleged above, and additionally as the assignee of ConAgra.

18.     The acts charged in this Complaint have been done by the following Defendants and were ordered and performed by Defendants' officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

19.     Allegations as to "Defendants," "co-conspirators," or "UEP members" herein refer to all named Defendants above unless otherwise specified.

### *Trade Groups*

20.     Defendant United Egg Producers, Inc. ("UEP"), is a cooperative corporation organized, existing, and doing business under the laws of the State of Maine with its office and principal place of business in Alpharetta, Georgia.

21.     United Egg Association ("UEA") is a nonprofit corporation organized, existing, and doing business under the laws of the District of Columbia, with its offices and principal place of business located in Alpharetta, Georgia.  Although UEA is not a named Defendant, UEA officers, staff, and members participated in the conspiracy as alleged in this Complaint.

20.     Defendant United States Egg Marketers, Inc. ("USEM") is a nonprofit corporation organized, existing, and doing business under the laws of the State of Georgia, with its offices and principal place of business located in Alpharetta, Georgia.

### *Hillandale Farms Defendants and Ohio Fresh Eggs*

21.     Defendants Hillandale Farms of Pa., Inc. ("Hillandale PA"), Hillandale-Gettysburg, L.P. ("Hillandale-Gettysburg"), Hillandale Farms East, Inc. ("Hillandale East"), and Hillandale Farms, Inc., function as an integrated enterprise producing and selling eggs. The Hillandale Defendants' integrated enterprise operates under the common name "Hillandale Farms." Hillandale PA has sold all of the shell eggs produced by its affiliate and supplier, Defendant Ohio Fresh Eggs, LLC ("Ohio Fresh"), since late 2003. Officers of these entities who participated in UEP meetings and committees were identified by UEP as representing "Hillandale Farms" collectively.

22.     Hillandale Farms is a vertically-integrated enterprise directly involved in every aspect of egg production and distribution. Each of the Hillandale Farms constituent companies is owned and controlled by Orland Bethel, Gary Bethel, and/or Don Hershey, either directly or through Hillandale PA.

23.     Hillandale PA is a corporation organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business located in North Versailles, Allegheny County, Pennsylvania. It is owned and controlled by Orland Bethel.

24.     During the relevant period, Hillandale PA marketed and sold UEP Certified shell eggs produced by Hillandale-Gettysburg and Ohio Fresh, and it sold shell eggs to Giant Eagle.

8

25.    Hillandale-Gettysburg is a limited partnership organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Gettysburg, Pennsylvania. Hillandale-Gettysburg is owned by Orland Bethel (50% ), the Bethel Family Trust (30%), and Don Hershey (20%). The General Partner of Hillandale-Gettysburg is HGLP LLC, which is owned by Gary Bethel and Don Hershey. Orland Bethel and Gary Bethel serve on the Hillandale-Gettysburg Board of Directors. Orland Bethel, Gary Bethel, and Don Hershey together control Hillandale-Gettysburg.

26.    During the relevant period, Hillandale-Gettysburg was a producer and processor of shell eggs, 95% of which were marketed by Hillandale East and bore the UEP or ACC Certified logos. Hillandale-Gettysburg is a member of UEP

27.    Hillandale East is a corporation organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business in Spring Grove, Pennsylvania. Hillandale PA is the majority owner (57%) of Hillandale East and controls Hillandale East. Gary Bethel is Hillandale East's President and also a minority owner (23%). Orland Bethel is Hillandale East's Secretary and Treasurer.

28.    During the relevant period, Hillandale East marketed and distributed UEP Certified shell eggs and egg products to purchasers in the United States, including 95% of Hillandale Gettysburg's egg production, which bore the UEP or ACC Certified logos.

29.    Hillandale Farms, Inc. is a corporation organized, existing, and doing business under the laws of the State of Ohio, with its principal place of business in Flushing, Ohio. Hillandale Farms, Inc. invoices its egg customers under the name "Hillandale Farms." Hillandale Farms, Inc. is a wholly owned and controlled subsidiary of Hillandale PA.

30.     During the relevant Period, Hillandale Farms, Inc. marketed and distributed UEP Certified eggs, including UEP Certified eggs produced by Hillandale-Gettysburg and Ohio Fresh, to purchasers in the United States.

31.     Ohio Fresh is a limited liability company organized, existing, and doing business under the laws of the State of Ohio, with its principal place of business in Croton, Ohio.  It owns egg production facilities in Ohio and is a member of the UEP.

32.     During the relevant period, 70% of the interest in Ohio Fresh was held by Hillandale Farms LLC, the sole member of which is Orland Bethel.  30% of the interest in Ohio Fresh was held by Eggs Manager LLC ("Eggs Manager"), the sole member of which is Don Hershey.  Pursuant to agreements executed December 26, 2003, Hillandale PA purchases all eggs produced by Ohio Fresh, and Eggs Manager manages and supervises the operations of Ohio Fresh.

33.     During the relevant period Hillandale PA (certification no. 182) and Ohio Fresh (certification no. 328) participated in the Animal Care Certification and UEP Certified programs and completed Animal Care Certified audits on behalf of UEP as part of a conspiracy to reduce the egg supply in the United States.

34.     Ohio Fresh also agreed to a May 2004 early flock disposal and coordinated molting schedule and signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens as part of the conspiracy to reduce the egg supply in the United States.

35.     In order to maintain its UEP certification, Hillandale PA was required to ensure compliance with UEP Certified guidelines for all egg production entities and affiliates that it owned, controlled, or managed, including Hillandale-Gettysburg.

36.     Under the control of Orland Bethel, Gary Bethel, and Don Hershey, Hillandale-Gettysburg agreed to comply and did comply with UEP Certified guidelines, and it submitted monthly compliance reports to UEP.  On information and belief, Hillandale-Gettysburg did not obtain a separate UEP certification apart from Hillandale PA's certification.

37.     UEP permitted Non-Certified marketers to sell eggs bearing the UEP or ACC Certified logos only if such entities obtained a UEP license to do so, paid annual licensing fees, and submitted monthly compliance reports.  Hillandale East and Hillandale Farms, Inc. were non-producer marketers of UEP Certified eggs produced by Hillandale-Gettysburg and Ohio Fresh, and the eggs they marketed bore the UEP or ACC Certified logos.  On information and belief, Hillandale East and Hillandale Farms, Inc. were not treated by UEP as Non-Certified licensed marketers, but rather the UEP permitted Hillandale East and Hillandale Farms, Inc. to market UEP Certified eggs because they were owned and controlled by Hillandale PA, and because under the control of Hillandale PA, Hillandale East and Hillandale Farms, Inc. agreed to participate in the UEP Certified program pursuant to Hillandale PA's UEP Certification.

38.     Hillandale PA, Hillandale-Gettysburg, Hillandale East, Hillandale Farms, Inc., and Ohio Fresh have participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Hillandale PA and Ohio Fresh, Hillandale-Gettysburg, and on information and belief Hillandale East and Hillandale Farms, Inc., explicitly agreed to the conspiracy alleged herein by agreeing to participate in the UEP Certified program and adopt UEP Certified guidelines .  Ohio Fresh also participated in the conspiracy to reduce the egg supply in the United States by agreeing to a May 2004 early flock disposal and

11

coordinated molting schedule and signing a commitment sheet in late 2004 to either reduce flock size or dispose of hens.

### *Weaver Bros.*

39.     Defendant Weaver Bros., Inc. ("Weaver Bros.") is a corporation organized, existing, and doing business under the laws of the State of Ohio, with its offices and principal place of business located in Versailles, Ohio.

40.     During the relevant period, Weaver Bros. sold eggs to purchasers in the United States, including Giant Eagle.

41.     Weaver Bros. is a member of UEP and during the relevant period Weaver Bros. participated in the Animal Care Certification and UEP Certified programs. Weaver Bros. was represented at and participated in UEP meetings, including by and through Tim Weaver.

42.     Weaver Bros. has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce egg supply and fix egg prices, as outlined herein. Weaver Bros. explicitly agreed to the conspiracy to reduce the egg supply in the United States alleged herein by participating in the UEP Certified program and adopting UEP Certified guidelines.

### *Sparboe Farms*

43.     Defendant Sparboe Farms, Inc. ("Sparboe Farms") is a corporation organized, existing, and doing business under the laws of the State of Minnesota, with its offices and principal place of business located in Litchfield, Minnesota.

44.     During the relevant period, Sparboe Farms provided shell eggs and egg products to retail, wholesale, and foodservice companies in 26 states.

12

45. Sparboe Farms also operates Sparboe Foods, an egg-breaking and further-processing company. Sparboe Foods operates plants in Iowa and California and serves industrial and foodservice customers in the central and western United States.

46. Sparboe Farms is a member of the UEP and its employees have served in key UEP executive positions and on UEP committees. Sparboe Farms employees have attended UEP meetings.

47. Sparboe Farms has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce egg supply and fix egg prices, as outlined herein. Sparboe Farms explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result.

48. Sparboe Farms has reached a settlement agreement with the Class Action Plaintiffs, as described below.

### Land O'Lakes, Moark, and Norco Ranch

49. Defendant Land O'Lakes Inc. ("Land O' Lakes") is a Minnesota corporation organized, existing, and doing business under the laws of the State of Minnesota, with its offices and principal place of business located in Arden Hills, Minnesota.

50. During the relevant period, Land O' Lakes sold shell eggs and egg products to purchasers in the United States directly or through its subsidiaries and affiliates.

51. Land O' Lakes has been an active participant in and benefited from its joint venture's, subsidiary's, and UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

13

52.     Defendant Moark, LLC ("Moark"), is a limited liability company organized, existing, and doing business under the laws of the State of Missouri, with its offices and principal place of business located in Norco, California.

53.     Moark Productions formed a joint venture with Land O' Lakes in 2000 to form Moark.  The companies jointly operated this joint venture from 2000 until 2006, when Land O' Lakes acquired 100% of the ownership of Moark.  During the time period of this joint venture, Moark was an active participant in the conspiracy as alleged herein.

54.     Moark developed a national LAND O' LAKES™ brand egg to complement other brands it marketed.  Moark, LLC, and its subsidiaries are referred to as the "Layer" or "Egg" division of Land O' Lakes.

55.     During the relevant period, Moark sold shell eggs and egg products to purchasers in the United States.  Approximately 64% of the eggs marketed are produced by layers owned by Moark.  The remaining 36% are purchased on the spot market or from third-party producers.

56.     Moark/Land O' Lakes is the nation's third-largest producer and marketer of shell eggs.  Moark/Land O' Lake's annual egg sales are approximately $500,000,000.

57.     Moark is a member of UEP and its employees have served in key executive positions and/or on committees of these organizations on behalf of Moark.  Moark employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

58.     Moark has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Moark has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result.  Moark explicitly agreed to a May

14

2004 early flock disposal and coordinated molting schedule in order to reduce supply. Moark signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply. Moark participated in a UEP meeting which expanded the 2004 flock/disposal scheme. Moark was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise egg prices.

59.     Moark is the parent company of Norco Ranch, Inc. ("Norco Ranch").

60.     Defendant Norco Ranch is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Norco, California. It is a subsidiary of Moark.

61.     During the relevant period, Norco Ranch sold shell eggs to purchasers in the United States.

62.     Norco Ranch is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Norco Ranch. Norco Ranch employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

63.     Norco Ranch has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Norco Ranch has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result. Norco Ranch explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce supply. Norco Ranch was a member of USEM and/or participated in egg exports, sharing any associated

15

financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise egg prices.

57.    Defendants Land O' Lakes, Moark, and Norco Ranch have reached a settlement agreement with the Class Action Plaintiffs, as described below.

### *Michael Foods*

58.    Defendant Michael Foods, Inc. ("Michael Foods") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Minnetonka, Minnesota.

59.    During the relevant period, Michael Foods sold shell eggs and egg products to purchasers in the United States, directly or through its subsidiaries and affiliates.  Michael Foods sold egg products to Giant Eagle.

60.    Michael Food Egg Products Company is a term used to refer collectively to subsidiaries of Michael Foods, Inc. that comprise Michael Foods's Egg Products Division.

61.    Michael Foods Egg Products is comprised of the following subsidiaries:  M. G. Waldbaum Co., Papetti's Hygrade Egg Products, Inc., MFI Food Canada, Ltd., and Trilogy Egg Products, Inc.

62.    Michael Foods Egg Products is the largest producer of processed egg products in North America and fourth-largest shell egg producer in North America.

63.    In 2006, approximately 30% of Michael Foods's egg needs were satisfied by company-owned hens, with the balance purchased under third-party egg procurement contracts and on the spot market.

64.     Michael Foods is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of the organizations on behalf of Michael Foods. Michael Foods's employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

65.     Michael Foods has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Michael Foods explicitly agreed to the conspiracy to reduce the egg supply in the United States alleged herein by participating in the UEP Certified program and adopting UEP Certified guidelines

### Rose Acre Farms

66.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is a corporation organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Seymour, Indiana.

67.     During the relevant period, Rose Acre sold eggs and egg products to purchasers in the United States.

68.     Rose Acre sells shell eggs and dried and liquid egg products for the foodservice industry.  Rose Acre is a vertically-integrated operation handling all of its own breeding chicks, milling feed, harvesting, cleaning, sorting, packing, and shipping eggs and egg products directly to retailers.

69.     Rose Acre is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Rose Acre.  Rose Acre employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

70.    Rose Acre has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Rose Acre has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result.  Rose Acre participated in a UEP meeting which expanded a coordinated 2004 flock/disposal scheme.  Rose Acre was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *National Food Corporation*

71.    Defendant National Food Corporation ("NFC") is a corporation organized, existing, and doing business under the laws of the State of Washington with its offices and principal place of business located in Everett, Washington.

72.    During the relevant period, NFC sold eggs and egg products to purchasers in the United States.

73.    NFC is a fully-integrated producer and processor of eggs and egg products, and sells shell eggs and egg products.  NFC operates its own feed mills, pullet farms, layer farms, processing plants, and distribution centers in Washington, Oregon, Montana, and South Dakota and serves markets throughout the Pacific Northwest, Alaska, Hawaii, and the Midwest.

74.    NFC is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of NFC.  During the time that the conspiracy was in effect, an NFC representative served as Chairman of the UEP and promoted the conspiracy as alleged herein.  NFC employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

18

75.     NFC has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein. NFC has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result. NFC explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce egg supply. NFC signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply. NFC participated in a UEP meeting which expanded the 2004 flock/disposal scheme. NFC was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise egg prices.

### Cal-Maine

76.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Jackson, Mississippi.

77.     During the relevant period, Cal-Maine sold shell eggs and egg products to purchasers in the United States.

78.     Cal-Maine is the largest producer and marketer of shell eggs in the United States. In fiscal year 2008, Cal-Maine sold approximately 678,000,000 dozen shell eggs (accounting for approximately 15.8% of domestic shell egg consumption).

79.     Fred Adams, founder and CEO of Cal-Maine, was a founding member of UEP.

80.     In fiscal year 2007, approximately 20% of Cal-Maine eggs were not produced by Cal-Maine: 7% were grown under production contracts and the remaining 13% were purchased on the spot market.

81.     Cal-Maine's customers are approximately 85% retail, 10% foodservice, and 5% egg products producers.

82.     Cal-Maine is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Cal-Maine.  During the time that the conspiracy was in effect, a Cal-Maine representative served as Chairman of the UEP.  Cal-Maine employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

83.     Cal-Maine has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Cal-Maine has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result.  Cal-Maine explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce egg supply.  Cal-Maine signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply.  Cal-Maine participated in a UEP meeting which expanded the 2004 flock/disposal scheme.  Cal-Maine was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise egg prices.

***Daybreak Foods***

84.     Defendant Daybreak Foods, Inc. ("Daybreak") is a corporation organized, existing, and doing business under the laws of the State of Wisconsin with its offices and principal place of business located in Lake Mills, Wisconsin.

85.     During the relevant period, Daybreak Foods sold eggs to purchasers in the United States.

86.     Daybreak is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Daybreak.

87.     Daybreak has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Daybreak has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result.  Daybreak participated in a UEP meeting which expanded a 2004 flock/disposal scheme.

***Midwest Poultry Services***

88.     Defendant Midwest Poultry Services, L.P. ("Midwest Poultry") is a limited partnership organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Mentone, Indiana.

89.     During the relevant period, Midwest Poultry sold eggs to purchasers in the United States.

90.     Midwest Poultry is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Midwest Poultry.

21

Midwest Poultry employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

91.     Midwest Poultry has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Midwest Poultry has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result.  Midwest Poultry signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply.  Midwest Poultry was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *NuCal Foods*

92.     Defendant NuCal Foods, Inc. ("NuCal Foods") is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Ripon, California.

93.     During the relevant period, NuCal Foods sold eggs to purchasers in the United States.

94.     NuCal is incorporated as an agricultural cooperative in California.  Egg producers that are part of NuCal include: (1) Gemperle Enterprises of Turlock; (2) Sunrise Farms of Petaluma; (3) J. S. West Milling of Modesto (whose President has served as the Chairman of the UEP); and (4) Valley Fresh Foods of Turlock.

95.     NuCal is the largest distributor of shell eggs in the Western United States.  NuCal is integrated from production through distribution and processes approximately 7.5 million eggs per day.

96.     NuCal is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of NuCal.  NuCal employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

97.     NuCal has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  NuCal has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch, as has each co-operative member.  NuCal has conspired to reduce its egg supply as a result.  NuCal members J.S. West and Sunrise Farms signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply.  NuCal members also participated in a UEP meeting which expanded the 2004 flock/disposal scheme.  NuCal was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### R.W. Sauder

98.     Defendant R.W. Sauder, Inc. ("Sauder"), is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its offices and principal place of business located in Lititz, Pennsylvania.

99.     During the relevant period, Sauder sold shell eggs and/or egg products to purchasers in the United States.

100.    Sauder is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Sauder. Sauder employees have attended UEP meetings and promoted efforts to reduce egg supply and fix egg prices.

101.    Sauder has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Sauder has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result. Sauder was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### Unnamed Co-Conspirators

102.    Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof. The identity of all co-conspirators is unknown at this time and will require discovery.

103.    At all relevant times, cage producers, egg trade groups, egg farm software companies, and other shell egg producers and egg product manufacturers or other entities, referred to herein as "co-conspirators," as well as various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

104.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers,

managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

105.    All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth at length.

## PENDING CLASS ACTION AND SETTLEMENT AGREEMENTS

106.    On April 7, 2010, T.K. Ribbing's Family Restaurant, LLC; Somerset Industries, Inc.; John A. Lisciandro d/b/a Lisciandro's Restaurant; Goldberg and Solovy Foods, Inc.; Karetas Foods, Inc.; Nussbaum-SF, Inc.; Wixon, Inc.; SensoryEffects Flavor Co. d/b/a SensoryEffects Flavor Systems; and Eby-Brown Company LLC (collectively "Class Action Plaintiffs") filed in this Court a Second Consolidated Amended Class Action Complaint, seeking to bring on behalf of themselves and all others similarly situated a class action alleging eggs price-fixing by the Defendants, in violation of the antitrust laws of the United States ("Class Action").

107.    The Class Action Plaintiffs have entered into a Settlement Agreement with Defendant Sparboe.  As part of that Settlement Agreement, Sparboe agreed to cooperate with the Class Action Plaintiffs, and Sparboe provided documents and information related to the allegations in the Class Action Plaintiffs' original complaint.

108.    Giant Eagle has incorporated much of the information provided by Sparboe to the Class Action Plaintiffs in this Complaint.  Additional information and references to documents provided by Sparboe is available in the Class Action Plaintiffs' Second and Third Consolidated Amended Class Action Complaints.

109.    The Class Action Plaintiffs have also entered into a Settlement Agreement with Defendants Land O' Lakes, Moark, and Norco Ranch. This Settlement Agreement requires these Defendants to cooperate by providing additional information and documents relevant to this matter.

## FACTUAL BACKGROUND

### *The Domestic Egg Industry*

110.    Egg production is characterized by two related sectors: the "shell egg" sector and the "egg products" (including "liquid eggs") sector. The shell egg sector consists primarily of "table eggs" that are sold for immediate consumption. Shell eggs are eggs generally purchased by grocery stores in cartons for resale to the consuming public. Shell eggs are also purchased by entities such as restaurants and hotels. The shell egg sector also produces "breaking eggs" for the "egg products" sector. Organic, free-range, and cage-free eggs are referred to as "specialty eggs," and purchases of those products are excluded from this lawsuit.

111.    The egg products sector consists primarily of eggs that have been removed from their shells and processed into dried, frozen, or liquid forms. In the commercial food manufacturing industry, egg products are often used as an ingredient in baked goods or in items such as mayonnaise, pasta, and salad dressings. Foodservice industry operators such as grocery stores, fast-food chains, restaurants, hospitals, and nursing homes use egg products for convenience and ease of handling and because egg products are pasteurized and thus ensure a higher level of food safety.

112.    The production, processing, packaging and distribution of shell eggs and egg products constitute and affect interstate trade and commerce.

26

113. In the past twenty years, the egg industry has become increasingly consolidated and it is now dominated by a few major players. In 1987 there were approximately 2,500 egg producing operations, and today there are fewer than 250 producers who own 95% of the U.S. laying flock. Approximately 60 companies own 80% of the U.S. egg laying flock.

### *Domestic Egg Production*

114. The egg industry consists largely of vertically-integrated producers who control every stage of the production of their products (e.g., hatching/rearing of birds, feeding, housing, husbandry, processing, packaging, and marketing of their product). Integrated operations generally hatch their own layer stock. Some egg producers also purchase their layer stock (day-old leghorn chicks) from an egg hatchery.

115. Shell egg producers generally raise their pullets (young female chickens that will become egg-laying hens when they are sexually mature) in cages. When a flock (group of layer hens) first enters egg production, approximately 10 to 20 percent of the hens are laying eggs at 18 to 22 weeks of age. The flock quickly reaches peak egg production (90-plus percent) around 30 to 32 weeks of age. Post-peak egg production (after 30 to 32 weeks of age) continually decreases to approximately 50 percent at around 60 to 70 weeks of age.

116. When the flock declines to around 50 percent production, producers may decide to molt the flock in order to achieve a higher level of egg production or to dispose of the birds.

117. After a molt, the flock will again increase egg production. Post-molt egg production will increase such that peak egg production in the flock reaches about 80 percent. Peak production following a molt is short-lived and the flock generally returns to 50 percent

27

production by 100 to 110 weeks of age. Once flock egg production falls below 50 percent again, a cost/benefit analysis is made whether to molt the birds for a second time or to dispose of them.

118.    The majority of hens are between 100 and 130 weeks of age when they reach the end of their egg production cycle. Hens may be molted a second time and then disposed of (at approximately 120 to 130 weeks of age) or disposed of following peak production after the first molt (at approximately 100 to 110 weeks of age).

119.    Due to the combination of the factors described above, scheduling earlier molting and earlier disposal of hens can result in less total egg production per hen.

### *Shell Egg Exports*

120.    Historically, the United States egg industry has been oriented toward local consumption, and the vast majority of the U.S. table egg production is consumed domestically. The relatively large size and affluence of the domestic market, the perishability of fresh shell eggs and costs of shipping, and agricultural policies in major world markets have tended to discourage exports, and the few eggs exported have typically been to nearby countries.

121.    American egg producers have historically avoided sales to Europe because of relatively low prices and shipping costs. As recently as 1998, total European Union egg imports from the United States were negligible because of European oversupply and low prices in the European Union market.

### *Egg Consumption*

122.    Although domestic annual per capita egg consumption fell substantially throughout the 1980s and early 1990s (from 275 in 1980 to 225 in 1992), it rose to 245 eggs in 1998. By 2005, annual U.S. per capita egg consumption had reached about 255 eggs.

28

123.    Egg products consumption has also continued to increase.  For example, 76.5 million cases of eggs were used in the manufacture of liquid, frozen, or dried egg products in 2004, compared to 53 million cases in 1997.

### The Egg Market:  Supply Impacts Price

124.    One of the single greatest influences on egg price is supply.  Even very small reductions in production can cause egg prices to rise sharply, and conversely a small increase in supply can cause egg prices to drop sharply.  That is because eggs are largely a homogeneous commodity, and demand for eggs is relatively inelastic:  consumers do not purchase fewer eggs when prices rise.

125.    Inelasticity of demand results in large part from there being no viable substitutes for eggs.  Eggs have attributes that are unmatched by other products.  These attributes differentiate eggs from potential substitutes.  Because of these qualities and characteristics, and the absence of viable substitutes, if the price of eggs is increased, not enough purchasers can switch to other products to make the price increase unprofitable.

126.    As the main inputs into egg products, the wholesale prices of shell eggs are closely linked to the prices of processed egg products.  Therefore, a reduction in the supply of shell eggs and resultant increase in shell egg prices would be reflected in increased prices for egg products as well.

### DEFENDANTS' ILLEGAL PRICE-FIXING CONSPIRACY

### The Trade Groups

127.    UEP is the largest egg trade organization in the United States.  UEP was formed in 1968 after a group of egg producers got together to discuss the price cycles of the egg

industry.  The producers formed UEP to provide services to the egg industry, including price

discovery, production and marketing information, industry leadership, an industry presence in

Washington, and industry promotion.  UEP produces the bi-weekly *United Voices* newsletter,

which is distributed to its members and is not available to the general public.

128.    Initially formed by five regional co-ops,[1] in 1998 UEP amended its charter to

become a group composed of individual member farms and producers.  By October 2007, UEP's

membership was at the highest level ever, with 198 members representing 270 million hens, 96%

of the total hens in the United States.

129.    UEP created UEA to provided services to those involved in the egg industry but

not qualified for UEP membership.

130.    USEM was created in 1982 by Jerry Faulkner, who served as UEP's first

Executive Vice President and General Manager.  In 2000, USEM merged with UEP and has

since been managed by UEP as a "subsidiary" or "division" of the organization.

131.    UEP now manages an "alliance" of five entities providing services to the egg

industry, including UEP itself, the three divisions of UEA, and USEM.  These entities are:

    (a)    United Egg Producers;

    (b)    United Egg Association Further Processor Division (established in 1983 as

            a trade association to represent those companies engaged in breaking and

            further egg processing into egg products);

---

[1] UEP's original regional cooperative members were (1) National Egg Company; (2) Northeast Egg Marketing Association; (3) Midwest Egg Producers; (4) Northwest Egg Producers; (5) Southwest Egg Producers; and (6) Western Egg Company.

(c)     United Egg Association Allied Industry Division (organized in January 1995 as a trade association representing companies or individuals who are engaged in providing products, services, consulting, and/or information services to the egg industry, but do not produce eggs or engage in the processing of eggs into egg products);

(d)     United Egg Association Producer and Packer Division (explicitly organized in September 1995 as a trade association to represent companies or individuals who pack or produce eggs but do not qualify for membership in a Capper-Volstead Cooperative); and

(e)     United States Egg Marketers (a producer cooperative established specifically for the purpose of exporting large quantities of U.S. Shell Eggs).

132.    Management for the entire alliance, which includes non-egg-producers like cage manufacturers, vaccine companies, poultry geneticists, manure conveyor belt manufacturers and others, is provided by UEP.

133.    UEP, UEA, and USEM all share the same address at 1720 Windward Concourse #230, Alpharetta, Georgia 30005.

### *Defendants Collectively Joined In Supply-Management Efforts In Order To Fix/Increase/Stabilize Egg Prices*

134.    Defendants undertook a coordinated effort to restrict egg supply through various means that have artificially fixed, maintained, and/or stabilized egg prices at supracompetitive levels throughout 2000 to the present.

31

135.    In 1994, UEP's long-time poultry research economist, Don Bell, determined that less eggs being produced meant more income for the egg industry, and that the only way to control supply would be through industry cooperation.

136.    In 1998, UEP changed its membership structure so that individual egg producers could join the organization, because producers realized that this would be a beneficial structure through which to coordinate supply management schemes. Defendants then decided to form an industry-wide supply control agreement.

137.    In August 1999, UEP invited its members to agree to reduce supply. UEP's economist, Don Bell, suggested four ways that Defendants could coordinate to reduce supply: (1) an industry-wide growth policy; (2) removal of birds from the flock; (3) a 2-3 percent reduction in chick purchases; and (4) a minimum floor space allowance.

138.    In late 1999, Defendants met to discuss Don Bell's proposals and other ways to coordinate supply management schemes. UEP's members voted on these proposals and agreed to: (1) an immediate molt of 5 percent of the flock; (2) to cut back 5 percent on flock inventory over the next 6-12 months; and (3) to develop a hatch reduction program. They also agreed to invite producers who were not present at the meeting to join this scheme.

139.    In concert with UEP's membership, during this period USEM's members also agreed to coordinate supply efforts and voted unanimously to reduce egg supply within the groups' membership. USEM members agreed that: each member would immediately molt 5 percent of their total flock by no later than October 15, 1999; each member would reduce their total flock by 6 percent by no later than November 20, 1999; and each member would maintain their flocks at the reduced levels through July 1, 2000. Further, USEM asked their Chairman to

appoint a committee to study and develop a chick hatch reduction program for consideration by the membership no later than November 3, 1999.

140.    At UEP meetings in the late 1990s and early 2000s, Defendants and other members extolled the benefits of decreased supply with respect to the price of eggs, discussed their own companies' participation in these collective schemes, and encouraged other companies to participate in industry-wide supply restriction efforts.

141.    At a UEP meeting in November 2001, Defendants agreed to a flock reduction of 5 percent.  Many producers signed "commitment sheets" to the collective scheme and joined the "core group" willing to reduce supply, while others agreed to the scheme in secret, not wanting to publicly associate with the program.

### Defendants Created A Pretextual Animal Husbandry Program In Order To Restrict Egg Output And To Fix Egg Prices

142.    Having succeeded in earlier attempts to control supply through coordinated molts and hen disposals, which temporarily raised prices to supracompetitive levels, Defendants realized that they needed a more reliable, long-term way to achieve supply reductions Defendants decided to use "animal husbandry" as a pretext to reduce the flock supply, and consequently the egg supply, and to provide additional market incentives and enforcement mechanisms to ensure the effective joint implementation of the supply restriction scheme. Defendants' "animal husbandry" guidelines, implemented through the UEP Certified program, were created as a front and pretext for the coordinated price-fixing scheme as alleged herein.

143.    Starting in 2000, Defendants decided to implement Don Bell's cage space recommendations as a program that eventually became known as the "Animal Care Certified

Program" (or "ACC"), and later was known as the "UEP Certified Program." The 2000
guidelines recommended that producers gradually reduce the number of hens per unit of cage
space by transitioning from 48 square inches per hen to 67-86 square inches per hen according to
a twelve-year phase-in schedule.

144.    These cage space guidelines were recommended by Don Bell, UEP's economist,
in 1999, solely as a more permanent way to reduce industry-wide egg supply and raise egg
prices. Defendants also agreed not to add cage capacity or otherwise make up for the hens that
would be lost through implementing the guidelines. These agreements had no basis in animal
husbandry, but were instead intended by the Defendants solely to reduce the egg supply and fix
egg prices.

145.    In 2001, Defendants agreed to shorten the cage space phase-in period from twelve
years to six. Eventually, over 80% of the egg industry became committed to this program.

146.    At UEP Animal Welfare Committee meetings starting in 1999, the participants
privately discussed the fact that the "animal husbandry" program's actual purpose was to reduce
egg supply by creating a protocol that would allow egg producers to reduce flock sizes with a
superficially legitimate public purpose.

147.    Defendants agreed to claim in public that the purpose of the program was for
"animal husbandry" in order to convince retailers and food manufacturers to accept the program
and the increase in prices that they intended to achieve. Privately, however, Defendants
acknowledged and discussed the fact that the program was conceived and intended to be a way
for the industry to jointly reduce chick hatch in order to address the supply dynamics that
periodically lowered egg prices. In settings that Defendants believed would be private (such as

34

industry meetings), Defendants were candid about the fact that the cage space requirements were designed and implemented to reduce egg supply and fix egg prices.

148.    Strict obedience to this scheme was necessary in order for Defendants to realize the aims of their price-fixing conspiracy, and for that reason the rules that restricted hen populations were the only rules that UEP strictly enforced.  In contrast, UEP guidelines that did not have a direct impact on hen populations or the total egg supply—including those that purportedly address humane treatment—could be violated with near impunity.

149.    The Federal Trade Commission investigated UEP's use of "Animal Care Certified" (its original name for the Certification Program) as being potentially misleading.  On September 30, 2005, the Federal Trade Commission announced an agreement with the UEP that the "Animal Care Certified" logo could no longer be used on egg cartons.  On September 21, 2006, UEP also paid $100,000 to settle claims from 16 state Attorneys General with regard to the misleading "Animal Care" claims.  Because the FTC and state Attorneys General had found the claims that the program offered humane care misleading, Defendants simply renamed the program "UEP Certified" in order to continue their price-fixing conspiracy.

### *The 100% Rule*

150.    Defendants agreed to devote 100% of their production to the UEP Certification Program (even if customers did not require Certified eggs); to not "backfill"; and to otherwise not make up for the hens lost as a result of increased cage space.  These agreements were unconnected to any perceived animal husbandry benefits.

151.    The 100% Rule was first implemented at UEP's Annual Board Meeting on October 10-11, 2002, in Savannah, Georgia.  The 100% Rule required that 100 percent of a

producer's egg houses must be maintained in accordance with the cage guidelines in order for a company to sell UEP Certified eggs. The 100% Rule was implemented solely to ensure that flock sizes were further reduced in line with the goals of the conspiracy laid out herein.

152.    Defendant Sparboe's general counsel, John Mueller, was concerned that the 100% Rule was a sham that was likely to be viewed as an illicit supply-management program that violated federal antitrust laws. Mueller expressed his concerns to Gene Gregory, UEP President, and other Defendants on a number of occasions. Nevertheless, Gregory and others pressured Sparboe to reduce supply and accept the 100% Rule.

### Enforcement

153.    Defendants realized that this supply management scheme needed strict auditing, compliance and oversight regimes, and they made sure to include those measures in their agreements. Thus, Defendants built reporting and auditing mechanisms into the UEP Certified program that allowed the cartel to monitor compliance and ensure that members were not cheating.

154.    Defendants also pressured egg buyers to demand UEP Certified eggs in order to motivate egg producers to participate, and thus further reduce the industry-wide egg supply. Defendants met directly with retailers and encouraged them to not purchase eggs unless they were UEP Certified, in an attempt to foreclose markets to producers that did not participate in Defendants' scheme.

155.    When egg producers attempted to leave the program, UEP contacted customers of those producers in order to convince them to buy only UEP Certified eggs.

36

156.    In 2003, Defendant Sparboe ended its participation in the UEP Certified program and the USEM export program.

157.    UEP President Gene Gregory then contacted several of Sparboe's customers and complained about those customers' purchases of non-UEP Certified eggs from Sparboe. Sparboe objected to UEP about these acts of retaliation, but UEP staff continued to contact Sparboe's customers.  In 2009, after the Class Action lawsuit was filed, UEP contacted Sparboe's customer, Wal-Mart, in an attempt to discourage the company from purchasing eggs from Sparboe.

158.    UEP also retaliated against Kreider Farm Eggs, another company that, like Sparboe, withdrew from the UEP certification program.

### Defendants' Output Restriction Schemes Began To See Results, and Defendants Urged Ongoing Compliance

159.    By 2003, 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) had agreed to the UEP Certified program.  In May 2003, UEP reported to members that the "Animal Care" program was achieving its goals of reduced chick hatch and it urged producers not to make up for lost production.  Again in July 2003, UEP warned producers not to make up for hens lost to the guidelines.  In September 2003, UEP urged producers not to increase egg supplies by holding hens for longer periods prior to disposal.  In December 2003, UEP discussed the record egg prices the industry was seeing and warned producers not to get "too greedy" and produce more eggs.

160.    At UEP's January 26, 2004, Shell Egg Marketing Committee meeting in Atlanta, Georgia, competing egg producers discussed hatch rates, cull rates, and flock inventories; noted

the responsiveness of price to supply; discussed that individual company objectives could be incompatible with the overall interests of the egg industry; and urged each other to realize that collective action to decrease supply was what caused egg prices to rise in 2003 compared to 2002.

### Defendants Agreed To Additional Supply Management Programs And Closed Loopholes In The UEP Certification Program

161.    After record high egg prices in 2003, egg flocks increased and egg prices were negatively affected. In March 2004, UEP warned about increased hatching and urged the industry not to expand supply.

162.    In order to regain control over prices, Defendants sought to renew their previous joint supply schemes, including flock reductions, hen disposals, and molting schemes to provide short-term supply reductions and quick relief for depressed prices.

163.    UEP's Marketing Committee met on May 10, 2004, in Washington, DC, and recommended that all UEP members molt flocks at 62 weeks and dispose of spent hens by 108 weeks, starting immediately and through August 2004. UEP asked its members to return an "intention form" indicating that they would agree to this scheme.

164.    In September 2004, UEP President Gene Gregory discussed the options available to producers to help reduce supply and fix prices, and encouraged them to remove older hens, sell hens at younger ages, and not backfill cages. Defendants jointly agreed to follow Gene Gregory's recommendations.

165.    At UEA's 2004 joint Annual Board Meeting in New Orleans, the UEP Board approved the following action to coordinate supply management proposal: "Hens currently

scheduled for disposal between December 2004 and July 2005 must be disposed of four weeks early or reduce your flock size by 5%."

***Defendants Convened An Economic Summit In Order To Coordinate Their Output-Restriction/Price-Fixing Scheme***

166.   Defendants held their "Egg Industry Economic Summit," which took place on January 26, 2004, in Atlanta, Georgia, specifically to coordinate a supply-reduction scheme and to obtain written commitments from co-conspirators agreeing to a price-fixing plan.  Producers with approximately 200 million hens were in attendance.

167.   Defendants asked producers to make their intentions known to their competitors and to explicitly agree to coordinate their supply reductions by signing on to one of the following two options: (1) disposing their hens that were scheduled for disposal between January 1 and April 30, 2005, four weeks earlier than previously scheduled; or (2) reducing their December 1, 2004, flock size by 5 percent from January 1 through April 30, 2005.

168.   The following Defendants, among others, were in attendance at the Economic Summit and signed on to the written agreement to follow one of two options to reduce supply and fix prices:  Cal-Maine; Moark; Ohio Fresh Eggs; Hillandale Farms; and Midwest Poultry. On December 3, 2004, UEP sent a follow-up letter to its members that had not yet signed on to the supply reduction program, asking them to choose an option and participate in the program.

169.   By December 2004, sixteen additional companies had signed on to the supply-reduction/price fixing agreement, including Defendants NFC and Sunrise Farms and J.S. West Milling (NuCal).

39

170.    At the January 25, 2005, UEP Board of Directors meeting in Atlanta, Georgia,

participants discussed the price-fixing proposal and other attempts to reduce supply.  The UEP

Board moved to extend the two-option program described above through Labor Day of 2005.

171.    In February 2005, UEP represented that 45 companies had agreed to reduce flock

size or dispose of hens.  UEP also stated that the motion extending the program would now apply

to all UEP members (including all Defendant UEP members herein) and not just those

companies that had signed commitment sheets.

172.    In 2004, Defendants also set out to respond to the problems that backfilling was

causing for the supply-reduction scheme implemented through the UEP Certified program.  In

the December 16, 2004,UEP Board of Directors Conference Call, the UEP Board voted to

prohibit backfilling as part of the UEP Certified program, except in the case of a catastrophic

mortality.  The Board also voted to treat backfilling the same as cage space allowances, and held

that any unauthorized backfilling would result in a failed audit.

173.    In April 2005, UEP requested that producers reduce egg supply by reducing their

flock sizes by 3 percent.

174.    On April 19, 2005, the UEP's Producer Committee for Animal Welfare met in

Chicago, Illinois, and moved that no new licenses to market Animal Care Certified eggs would

be issued or renewed to producers who were not ACC Certified, and that a license to market

ACC eggs could be issued to shell egg processors and further egg processors who did not own or

operate egg production facilities.  Among the reasons cited for these motions was an effort to

gain 100 percent participation and to counteract economic temptations to leave the program.

Participants noted that the motions would limit the free trade of eggs, and that the ACC program,

nominally an animal husbandry program, was now managing the marketing and restricting the movement of eggs.

175.    In May 2005, UEP reported a successful flock reduction of 3.9 million hens.  UEP stated that Animal Care Certified companies representing approximately 80% of all U.S layers had collectively reduced their flock size over the past two years, and it asked producers whether they had reduced their flock sizes yet, noting that further flock reductions would be beneficial for egg prices.

176.    In January 2006, UEP President Gregory discussed his "New Year's Resolution," which again urged members to reduce egg production in the upcoming months.  In January and February 2006, Defendants with and through the UEP proposed another 2 percent reduction in all members' hen populations.

177.    In April 2006, UEP issued a "Supply/Demand Alert" and noted that UEP's Marketing Committee had proposed a new recommended plan of action to jointly reduce supply: molting flocks and disposing flocks six weeks earlier than previously scheduled.  One month later, in May 2006, UEP reported that the size of the nation's layer flock declined by a little more than 3 million hens in April.

178.    In August 2006, UEP noted that the Marketing Committee's recommendations for the weeks between Easter and Labor Day were to molt and dispose of flocks six weeks earlier than previously scheduled, and urged members to complete this program.

179.    In February 2008, Defendants proposed that producers reduce supply after Easter by utilizing a coordinated "Production Planning Calendar."

***Defendants Implemented An Egg Export Scheme In Order To Reduce The Domestic Egg
Supply And Fix Domestic Egg Prices***

180.    During the relevant period, the Defendants collectively, and in coordination with

and through UEP and USEM, conspired to increase the quantity of eggs and processed egg

products exported from the United States in order to fix domestic egg prices. The program was

designed to export shell eggs even where the export prices were lower than domestic egg prices.

Defendants determined that the benefits of raising domestic U.S. prices through reduced supply

would offset the losses associated with these exports.

181.    Defendants Cal-Maine, Moark, and Rose Acre, among others, consistently

participated in the export program for eggs and tried to encourage other egg producers to

participate in the program with the intent to increase egg prices for domestic buyers.

182.    As part of the export program, and in order to ensure that exporting members

captured their share of the benefits of this price-fixing scheme, USEM members that did not

export eggs agreed to reimburse the USEM members that provided eggs for the export, in order

to share any losses incurred when exporting shell eggs (the loss reimbursed by non-exporting

USEM members was the difference between the export price and the available domestic price).

183.    At the UEP Board of Directors Legislative Meeting on May 12-15, 2003, in

Washington, DC, Dolph Baker (Cal-Maine), Chairman of the Marketing Committee, noted the

domestic market effects of egg exports and urged every producer to participate.

184.    On May 27, 2005, Defendant Sparboe terminated its membership with United

States Egg Marketers and stopped participating in the export scheme. On June 21, 2005, UEP

42

President Gene Gregory acknowledged the purpose of the exports was to raise domestic prices and thanked Sparboe for helping to participate in this cooperative effort to fix prices.

185.    Both before and even after Sparboe left the export program, it received pressure from UEP management and members to participate in the export program by providing eggs for export or alternatively funds to make up for the losses that other UEP members experienced by participating in the egg export program.

186.    In mid-2006, the Defendants ramped up their efforts to export shell eggs and processed egg products with the intent to further reduce egg supply in the United States and increase domestic egg price.  Defendants had determined that even exporting a small percentage of eggs, as little as 1 or 2 percent, could reduce supply in the United States enough to have a significant impact on domestic egg prices.

187.    In late 2006, Defendants agreed to expand the export program and pursued their plan to export more eggs and egg products, even though foreign egg and egg product prices were lower than egg prices in the United States, and even though Defendants would have to absorb shipping costs.  There was no independent business reason for each Defendant on its own to undertake costly exports at the expense of more profitable domestic sales.  But due to their coordinated efforts, Defendants determined that any lost profits from the export program would be offset by the reductions in domestic supply and corresponding increase in domestic egg and egg product prices.

188.    Defendants devised and implemented their export conspiracy during USEM and UEP meetings in mid-2006 and the fall of 2006.  As a result of this conspiracy, exports from the United States to foreign markets, including Europe, suddenly increased dramatically.

189.    In November 2006 through April 2007, USEM voted to approve exports totaling approximately 890 container loads of shell eggs (each container holds approximately 800 cases). In the first six months of 2007, exports of table eggs were up 139% by value and 100% by volume compared to the same period in 2006, with processed egg product exports up 32% by value and 12% by volume.  The volume of table egg exports from the United States to Europe specifically was up 6,101%, and egg product exports to Europe were up 183%.  These exports also came at a time of depressed European egg consumption and over-supply in the European markets.

190.    In August 2007, USEM approved the sale of 132 container loads of eggs for export starting with delivery the week of August 20.

191.    Defendants' export conspiracy continued at least through spring 2008.  Since the pace at which domestic egg prices dropped was proportional to supply, Defendants agreed to use exports through USEM as a way to maintain supply during periods of lower demand.  When Defendants observed some softening of domestic egg prices in March 2008, Defendants responded by having USEM arrange another export of 100 containers of fresh eggs.  The timing of these exports corresponded with a period when Defendants were undertaking a forced molt of layers.  These exports caused a reduced supply following the 2008 Easter holiday season.

### *Defendants' Output-Restriction Schemes Caused Record Price Increases*

192.    Defendants' various schemes to reduce output repeatedly caused egg prices to soar to record levels from 2003 through 2008, and to supracompetitive levels throughout the relevant period.

193.     In addition to its effect on the prices of shell eggs, the unlawful conspiracy described above resulted in supracompetitive prices for the egg products.

194.     Many Defendants and co-conspirators had their own laying hens and shell egg production facilities, as well as egg processing facilities.  As such, these entities benefited from both the supracompetitive prices for their shell eggs as well as the supracompetitive prices for their egg products resulting from the overall reduction in the supply of shell eggs.

195.     Some Defendants and co-conspirators purchased shell eggs to process into egg products, including Michael Foods, Moark, Rose Acre, NFC, Cal-Maine, and RW Sauder.  These entities were able to benefit from Defendants' conspiracy even though they purchased shell eggs at supracompetitive prices because the conspiracy artificially increased prices in the market for their egg products as well.

196.     UEP, which includes producers and sellers of both shell eggs and egg products, viewed its relevant efforts as affecting both shell eggs and egg products, and those efforts benefited from the support and involvement of UEA-only members (UEA has a further-processors division made up of companies that primarily process shell eggs into egg products). UEA members were aware of, supported, and participated in the conspiracy to restrict egg output, and they also assisted in artificially fixing, raising, maintaining, and stabilizing the prices for egg products.

## DEFENDANTS ARE NOT ENTITLED TO THE LIMITED PROTECTIONS OF THE CAPPER-VOLSTEAD ACT OR THE COOPERATIVE AGRICULTURAL ACT OF OHIO

197.     UEP sometimes purports itself to be a "federated Capper-Volstead Agriculture Cooperative," but during the relevant period, membership in UEP was not restricted to egg

producers.  UEP membership was open to any person, firm, or partnership engaged in the

production of table eggs, breeder flocks, started pullets, or who was a contract egg producer on

premises owned or operated by such entity.  UEP did not ask what percentage of a prospective

member's business was related to egg production or how much of a producer's egg business was

related to contract production.

198.    Accordingly, some members of UEP are not egg producers.  For example, M&C

Anderson Pullets, a UEP board member, raises pullets for egg farms and does not produce or sell

eggs.  Companies that did not produce eggs actively participated in UEP meetings, including

Chore Time Egg, a manufacturer of egg equipment, and Cargill, a further processor of eggs.

199.    Further, a number of UEP members market eggs produced under production

contracts with growers who possess their own egg-production facilities.  Thus, some of these

members, such as Defendant Michael Foods, do not produce a majority of the eggs they market,

but act mostly as conduits for other producers' eggs.  J.S. West Milling Co. (a member of the

NuCal cooperative and a UEP member) is "a multi-faceted farming business with egg production

and processing, feed mills, a propane business, an Ace Hardware, a lumber company, and

almond orchards."

200.    UEP itself does not engage in any of the functions enumerated under the Capper-

Volstead Act.  UEP does not grow, harvest, ship, sell, bargain, or compete for the sale of eggs or

any agricultural products.  UEP does not wash, candle, grade, break, pasteurize, package, store,

transport, distribute, or market its members' eggs.  UEP does not negotiate contracts of sale for

its members.  UEP merely serves as a broad egg industry trade group, and UEP often refers to

itself publicly as a "trade organization" or "trade group" and not a "cooperative."

201.    UEP members are large, vertically-integrated competitors, not small farmers banding together to deal with the corporate middlemen who would otherwise market their eggs. UEP members do not associate to collectively process, handle, and market their products, and UEP does not provide those services.

202.    Further, in implementing the output-restriction scheme discussed herein, UEP conspired with non-member co-conspirators. For example, UEP conspired with USEM and UEA-only members.

203.    During the relevant period, UEP's annual meetings were held in conjunction with UEA meetings, and members of both organizations attended joint meetings. UEP's price-fixing schemes were discussed and implemented at these meetings by members of UEP and UEA-only members. It was only in 2009, after the filing of the Class Action, that UEP finally prohibited UEA-only members and non-egg producers from participating in the UEP's discussions and meetings about their price-fixing schemes.

204.    Many UEA members and executives were also members of the UEP and USEM, and many members of the Defendants held positions in both USEM and UEP.

205.    Gene Gregory was the President and Chief Executive Officer of UEP. Gregory was also President of UEA and President of USEM (Gene Gregory's son, Chad Gregory, was Senior Vice President of both UEP and UEA). As President of all three entities (UEP, UEA, and USEM), Gene Gregory directed, participated in, and authorized UEP's unlawful conduct as detailed herein. This participation includes Gregory's attendance at numerous meetings with UEP, USEM, UEA-only members, and other participants in the conspiracy, and advocating the relevant egg supply restrictions.

206.   UEP and UEA shared staff, and UEA also provided direct financial support for many of UEP's projects, including those related to the price-fixing schemes described herein. For example, at their 2004 annual meeting, UEA members voted to set aside $20,000.00 that could be used by UEP for its animal welfare program, and approved a budget which provided a further $40,000.00 for UEP's management. At their 2005 annual meeting, UEA approved a budget providing approximately $70,000.00 for UEP programs and management.

207.   The price-fixing conspiracy embodied by the UEP Certified program also included non-producers. For example, in 2006, UEP's Animal Welfare Committee approved the use of a Non-Certified License Agreement for UEP and UEA member companies that did not own layers, allowing Non-Certified companies to purchase eggs from UEP Certified companies for the marketing of Certified eggs.

208.   UEP also conspired with egg producers that were not UEP members, allowing them to join the UEP Certified program and thereby coordinate reductions in their own egg supplies.

209.   UEP also conspired with non-member cage manufacturers and other entities involved in egg production that are not agricultural producers. Cage manufacturer representatives were often invited to UEP meetings where supply management issues were discussed in order to provide input and support for the UEP Certified program. Cage manufacturers also held numerous leadership positions in the UEA.

210.   John Mueller, former in-house counsel for Defendant Sparboe, believed that the membership and participation of non-egg-producing companies ran counter to the Capper-Volstead Act, and threatened the UEP's claimed protection from antitrust liability under the Act.

Mr. Mueller raised his concerns with UEP officials, but UEP continued to operate with non-producers as members and with non-producers attending meetings where supply restrictions were discussed and implemented.

211.    In 2007, UEP considered forming a "supply-managed cooperative" that might have some protection under the Capper-Volstead Act, an implicit acknowledgement that the present incarnation of UEP did not qualify for such protection.

212.    As discussed in further detail above, UEP and its members also retaliated against egg producers that tried to leave the conspiracy.  UEP's retaliatory activities against its own members went beyond the legitimate objectives of a cooperative and destroyed any Capper-Volstead protections, even assuming they ever existed.

213.    In summary, UEP is not entitled to the limited protections found in the Capper-Volstead Act and Cooperative Agricultural Act Of Ohio for at least the following reasons:

(a)    UEP is not a legitimate co-operative and does not market, process or sell eggs; rather it is a trade group designed to protect the interests of the broadly-defined egg industry;

(b)    UEP consists mainly of vertically-integrated members who market, process and sell their own eggs;

(c)    UEP has members that are not involved in agricultural egg production;

(d)    UEP has many members that process other producers' eggs or who supply eggs to members on a contract basis;

(e)    UEP conspired with UEA-only members, and the UEA is a trade group explicitly made up of entities not qualified for Capper-Volstead protection;

49

(g)     UEP conspired with non-member egg producers and other non-member

entities to restrict egg output and fix egg prices;

(h)     UEP retaliated against producers that left the price-fixing scheme; and

(i)     UEP's supply-restriction and price-fixing efforts fall outside of the limited

purposes of the Capper-Volstead Act.

## FRAUDULENT CONCEALMENT AND TOLLING

214.     The Defendants' price-fixing conspiracy was self-concealing, and throughout the

relevant period Defendants affirmatively concealed from Plaintiff Giant Eagle their unlawful

conspiracy.  Consequently, despite the exercise of reasonable due diligence Giant Eagle was

unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying

higher prices for shell eggs and egg products than it would have paid in a competitive market

until the Class Action Plaintiffs settled with Sparboe and filed the Second Consolidated

Amended Class Action Complaint on April 7, 2010.

215.     During the relevant period, Giant Eagle negotiated its prices paid for shell eggs

from Defendants Hillandale PA and Weaver Bros. using the Urner-Barry egg price index as its

guide to current market prices.

216.     Giant Eagle's main shell egg buyer during the relevant period was Paul Moran.

217.     Mr. Moran recalls verbal conversations with Gary Bethel of Hillandale PA and

Tim Weaver of Weaver Bros. about what was going on with market prices for eggs on various

occasions ranging between 2003 or 2004 and 2008 or 2009.  In these conversations, Mr. Bethel

and/or Mr. Weaver represented to Mr. Moran that exports of eggs and the phase-in of the UEP's

cage-size program were causing supply effects that were contributing to these price effects.  Mr.

Moran was not told the details of these programs but Mr. Bethel and/or Mr. Weaver represented the programs as only having inadvertent effects on prices, and they did not reveal to Mr. Moran that the intended purpose of these programs was to further a conspiracy to reduce the supply and increase the market price of eggs in the United States. Mr. Moran accepted the representations of Mr. Bethel and/or Mr. Weaver as true and complete and consequently he reasonably did not conduct further inquiry into the causes of any egg price dynamics.

218.   On information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy through non-public means, and agreed not to discuss or disclose the details of their conspiracy for the purpose of concealing their conspiracy from the public and their egg-buying customers, including retailers like Giant Eagle. Defendants' activities included, but are not limited to, the following:

> (a)   concealment of UEP audits and monitoring results which were not publicly available or available to Giant Eagle;
>
> (b)   hosting UEP, UEA, and USEM meetings at which the conspiracy was designed and implemented, which were private and not open to members of the public or to Giant Eagle;
>
> (c)   concealment of UEP meeting minutes which were not distributed to the public or to Giant Eagle;
>
> (d)   distribution of UEP's internal newsletter, which urged compliance with and distributed information about the conspiracy and which was not distributed to the public or to Giant Eagle; and

       (e)     making false public statements that supply reductions were merely an inadvertent consequence of their attempts to treat hens humanely.

219.    Defendants repeatedly and falsely represented to the public that the UEP Certified program, one of the key elements of Defendants' conspiracy to restrict egg output and fix egg prices, was motivated by animal husbandry concerns. Defendants agreed to claim in public that the purpose of the program was for animal husbandry in order to convince their egg customers, including retailers like Giant Eagle, to accept the program and therefore to accept the increased egg prices that resulted from the program. Privately, Defendants acknowledged and discussed the fact that the program was conceived and intended as a way for the industry to conspire to reduce egg supply and increase the market price for eggs.

220.    Giant Eagle did not learn until the Class Action Plaintiffs settled with Sparboe and filed the Second Consolidated Amended Class Action Complaint the following facts that Defendants had not previously made known to Giant Eagle, and on information and belief had not made known publicly:

       (a)     Defendants were reimbursing each other for export losses;

       (b)     UEP was retaliating against UEP members that exited the conspiracy;

       (c)     Defendants were contacted about the possibility of ongoing antitrust violations by at least one of its members;

       (d)     Defendants were aware of, and discussed, potential antitrust violations as a result of their conduct; and

(e)     Animal welfare was not the primary motivating factor for the cage space

program, and reducing the egg supply in the United States was an intended

purpose of the program.

221.    But for the Class Action Plaintiffs settling with Sparboe and filing the Second

Consolidated Amended Class Action Complaint, Giant Eagle would never have discovered these

facts, despite the exercise of reasonable due diligence.

222.    Giant Eagle's main egg buyer during the relevant period, Paul Moran, exercised

reasonable due diligence in light of observable changes in egg market prices by having

conversations with Giant Eagle's egg suppliers about the causes of those price changes,

including the export and cage-size guideline programs.

223.    Giant Eagle failed to discover the alleged conspiracy prior to the filing of the

Second Amended Class Complaint because of the deceptive descriptions of the export and cage-

size programs it received from its egg suppliers and the other techniques of secrecy employed by

the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their

conspiracy from the public and their egg customers, including retailers like Giant Eagle.

224.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

of any statute of limitations was tolled until the filing of the Second Amended Class Complaint

with respect to any claims that Giant Eagle has as a result of the anticompetitive conduct alleged

in this Complaint.

### THE EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT AND INJURY TO GIANT EAGLE

225.     The aforesaid conspiracy had the following effects, among others:

(a)     Price competition among the Defendants and their co-conspirators in the sale of shell eggs and egg products was restrained and suppressed;

(b)     Prices of shell eggs manufactured and sold in the United States by the Defendants and their co-conspirators were fixed, raised, maintained and/or stabilized at supracompetitive levels; and

(c)     Prices of egg products manufactured and sold in the United States by the Defendants and their co-conspirators were likewise fixed, raised, maintained, and/or stabilized at supracompetitive levels.

226.     As a result of the effects described above, Giant Eagle was deprived of the benefits of free and open competition in the purchase of shell eggs and egg products. Giant Eagle was, and continues to be, damaged in its business or property in that it paid supracompetitive prices for shell eggs and egg products during the relevant period, which were higher prices than Giant Eagle would have paid in the absence of the Defendants' conspiracy.

### COUNT I
**(Restraint of Trade in Violation of Section 1 of the Sherman Act 15 U.S.C. § 1)**
**(Against All Defendants)**

227.     Giant Eagle incorporates by reference as if fully set forth herein, the preceding allegations of this Complaint.

228.     Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy in unreasonable restraint of interstate trade and commerce in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which had the purpose and effect of fixing, raising, maintaining and/or stabilizing the prices of eggs at artificially high, non-competitive levels in the United States.

229.    The aforesaid contract, combination, and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated, among other ways, by the following acts:

(a)    Defendants acted in concert with competitors, with and through the UEP and other trade groups, and with non-member co-conspirators, and contracted, conspired, and combined to effectuate a substantial reduction of the production and supply of eggs, with the purpose and effect of fixing egg prices at supracompetitive levels;

(b)    As part of Defendants' agreement to fix the price of eggs, the Defendants: drafted guidelines with animal husbandry as a pretext, but with the knowledge and understanding that the guidelines would be used by their co-conspirators to substantially reduce egg production; manipulated molting, backfilling, and hen disposal schedules to keep production low; manipulated and reduced chick hatching; coordinated with co-conspirators to reduce or delay the introduction of added egg capacity through the construction of new hen houses or other means; and reduced production rates at existing eggs farms;

(c)    Defendants also conspired and agreed to export shell eggs and processed egg products abroad with no legitimate business purpose other than to fix

the prices for shell eggs and processed egg products within the United

States at supracompetitive levels.  These exports were normally, if not

always, at prices below those for which the same eggs could have been

sold in the U.S. domestic market;

(d)    To maintain their overarching price-fixing conspiracy, Defendants took

significant steps throughout 2000 through at least 2008, which resulted in

supracompetitive prices for eggs through the present.

230.    The conspiracy had its intended effect, and Defendants benefited from the egg

prices they fixed as described herein.

**WHEREFORE**, Plaintiff respectfully requests relief as set forth in the Prayer for Relief.

## COUNT II
### (Violation of the Ohio Valentine Act)
### (Against All Defendants)

231.    Giant Eagle incorporates by reference as if fully set forth herein, the preceding

allegations of this Complaint.

232.    Defendants and their co-conspirators engaged in a continuing contract,

combination, and conspiracy in unreasonable restraint of interstate trade and commerce in

violation of The Ohio Valentine Act, Ohio Rev. Code §§ 1331.01, and 1331.04-05, which had

the purpose and effect of fixing, raising, maintaining and/or stabilizing the prices of eggs at

artificially high, non-competitive levels in the United States, including in Ohio.

233.    The aforesaid contract, combination, and conspiracy between and among the

Defendants and their co-conspirators was furthered and effectuated, among other ways, by the

following acts:

56

(e)      Defendants acted in concert with competitors, with and through the UEP and other trade groups, and with non-member co-conspirators, and contracted, conspired, and combined to effectuate a substantial reduction of the production and supply of eggs, with the purpose and effect of fixing egg prices at supracompetitive levels;

(f)      As part of Defendants' agreement to fix the price of eggs, the Defendants: drafted guidelines with animal husbandry as a pretext, but with the knowledge and understanding that the guidelines would be used by the co-conspirators to substantially reduce egg production; manipulated molting, backfilling, and hen disposal schedules to keep production low; manipulated and reduced chick hatching; coordinated with co-conspirators to reduce or delay the introduction of added egg capacity through the construction of new hen houses or other means; and reduced production rates at existing eggs farms;

(g)      Defendants also conspired and agreed to export shell eggs and processed egg products abroad with no legitimate business purpose other than to fix the prices for shell eggs and processed egg products within the United States at supracompetitive levels.  These exports were normally, if not always, at prices below those for which the same eggs could have been sold in the U.S. domestic market;

    (h)     To maintain their overarching price-fixing conspiracy, Defendants took significant steps throughout 2000 through at least 2008, which resulted in supracompetitive prices for eggs through the present.

234.    The conspiracy had its intended effect, and Defendants benefited from the egg prices they fixed as described herein.

235.    The Defendants' conspiracy is not a joint activity protected by the exemption from the Ohio antitrust laws created by the Cooperative Agricultural Act of Ohio, Ohio Rev. Code § 1729.70.

**WHEREFORE**, Plaintiff respectfully requests relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

a.    That Defendants' unlawful combination and conspiracy as set forth in this Complaint be adjudicated and decreed:  a *per se* violation of the Sherman Act, 15 U.S.C. § 1; an unreasonable restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1; and a violation of the Ohio Valentine Act, Ohio Rev. Code §§ 1331.01, 1331.04, and 1331.05;

b.    That Plaintiff recover damages against Defendants, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a) and Ohio Rev. Code §1331.08;

c.    That Plaintiff be awarded its expenses and costs of prosecuting this action, including reasonable attorneys' fees and experts' fees and costs to the extent provided by law;

d.      That Plaintiff be awarded pre-judgment and post-judgment interest at the
highest legal rate allowable by law;

e.      That this Court permanently enjoin all continuing and future unlawful
activity by Defendants in violation of the antitrust laws; and

f.      That Plaintiff be awarded such additional relief as the Court may deem
proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Giant Eagle demands trial by jury of all issues so
triable.

Respectfully submitted,

Dated:  February 10, 2012

Bernard D. Marcus
PA ID No. 01293
Moira Cain-Mannix
PA ID No. 81131
Brian C. Hill
PA ID No. 204489
MARCUS & SHAPIRA LLP
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, PA 15219
(412) 471-3490
Fax (412) 391-8758

*Counsel for Plaintiff, Giant Eagle, Inc.*

59